UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 15-2688(DSD/BRT)

Watkins Incorporated,

        Plaintiff,

v.                                     **ORDER**

McCormick and Company,
Incorporated,

        Defendant.

      Charles G. Frohman, Esq., James J. Long, Esq. and Maslon
      LLP, 90 South Seventh Street, Suite 3300, Minneapolis, MN
      55402, counsel for plaintiff.

      David H. Bamberger, Esq. and DLA Piper US LLP, 500 Eighth
      Street NW, Washington DC 20004, counsel for defendant.

This matter is before the court upon defendant McCormick and
Company, Inc.'s motions to exclude plaintiff's expert and for
summary judgment. Based on a review of the file, record, and
proceedings herein, and for the following reasons, the defendant's
motions are denied.

**BACKGROUND**

This dispute arises out of plaintiff Watkins Inc.'s
allegation that McCormick deceived consumers about the price of
its black pepper and diverted sales from Watkins's competing
products. McCormick historically has been the industry leader in

the consumer market for black pepper.  Nelson Decl. Ex. 5, at 7.
For decades, it sold its black pepper in distinctive red and white
metal tins of three sizes – a small tin with two ounces, a medium
tin with four ounces, and a large tin with eight ounces.[1]  Rochford
Dep. at 27:6-28:25, 29:25-31:3, 31:4-32:5.  Because the tins are
made of metal, consumers cannot see the product inside.  Id.

    Watkins also sells black pepper and competes with McCormick
in the consumer market.  Rigley Decl. Ex. 1, at 2:6.  Along with
other sellers, Watkins modeled its black pepper tins after
McCormick's because consumers are accustomed to buying black
pepper with this packaging, appearance, size, and shape.  Rigley
Dep. at 39:2-7.

    In 2015, Watkins began a test of its ground black pepper at
approximately 500 Walmart stores.  Rigley Decl. Ex. 1, at 5; Nelson
Decl. Ex. 30.  During the test, the selected stores carried
Watkins's black pepper to assess its sales performance.  Rigley
Dep. at 30:18-31:15.  Walmart regularly tests products to determine
its interest in carrying the products long-term, and Watkins
previously participated in tests with several of its other
products.  Id. at 28:1-29:11; 27:21-30:11.  For example, Watkins's
vanilla extract performed well in its 2005 test, and in response,

---

[1] McCormick also sells black peppercorn grinders.  Although
McCormick allegedly engaged in the same behavior with its grinders,
those products are not directly at issue in this litigation.

2

Walmart elected to continue selling the product beyond the test period and to expand its distribution to 3,000 stores.  Nelson Decl. Ex. 34, at 28:1-12; 30:8-11.  Based in part on this experience, Watkins expected Walmart to expand its black pepper distribution chain-wide if its test was similarly successful.  Id.

Watkins internally projected that it would sell 6.9 units per store per week of its small tins and 5.8 units per store per week of its medium tins during the test period.  Nelson Decl. Ex. 33. Walmart independently projected that Watkins would sell four units per store per week of both the small and medium tins.  Id. Ex. 34. Neither Walmart nor Watkins, however, clarified whether such performance would be deemed a "success" or established other metrics or parameters to define what qualified as a successful test.  Rigley Dep. at 31:15-32:9.

In the test, Watkins's black pepper competed primarily with McCormick's ground pepper, and the two products appeared side by side on Walmart's shelves.  Rigley Dep. at 34:8-18; O'Leary Dep. at 17:19-18:2, 41:2-6.  Before the test began, Walmart expressed concern that Watkins's products were priced too high and told Watkins that its prices would likely impact sales numbers.  O'Leary Dep. at 41:7-14; Nelson Decl. Ex. 32.

Watkins, however, downplayed these concerns.  The commodity price of black pepper had significantly increased in recent years, and Watkins believed that all suppliers would soon raise wholesale

and retail prices in response.  Nelson Decl. Ex. 10; O'Leary Dep. at 41:12-17, 43:2-5; Nelson Decl. Ex. 32.  Thus, Watkins assured Walmart that its prices would soon be more competitive.  O'Leary Dep. at 41:12-17, 43:2-5; Nelson Decl. Ex. 32.

Despite Watkins's confidence, McCormick chose to manage the commodity price increase differently.  Knowing that black pepper consumers were price sensitive, McCormick sought to "[p]reserve shelf price" while simultaneously managing its higher costs. Nelson Decl. Ex. 5, at 8; Ex. 28.  To achieve this goal, McCormick maintained its tin price but reduced the volume of pepper in each tin.  Nelson Decl. Ex. 29, at 15.  Specifically, McCormick reduced the volume of black pepper in its small tin from two ounces to 1.5 ounces, its medium tin from four ounces to three ounces, and its large tin from eight ounces to six ounces.  Id. at 6.  McCormick did not alter the dimensions of the tins themselves but did print the reduced volume on the label.  Id.; Nelson Decl. Ex. 35.

McCormick launched the reduced-volume tins the month before Watkins's Walmart test began.  Nelson Decl. Ex. 29.  Several months into the test, Watkins learned of McCormick's volume change when a Walmart employee told them to "look at what's happening at shelf in our stores in regards to pepper and the competition."  Rigley Dep. at 43:11-44:4.  Watkins interpreted this comment to mean that it should investigate pricing of black pepper products at Walmart.

Rigley Decl. Ex. 1, at 10.   Watkins did so and discovered the reduced-volume, and subsequently lower-price, McCormick tins.   <u>Id.</u>

Watkins alleges that McCormick's reduced-volume tins amounted to false advertising.[2]   2d Am. Compl., ECF No. 61-22, at 10-12. According to Watkins, consumers relied on McCormick's tin size to advertise the amount of pepper they were purchasing.   <u>Id.</u> at 4. Thus, Watkins contends that the change in volume without a corresponding change in tin dimensions resulted in consumer confusion and deception.   <u>Id.</u>

Specifically, Watkins alleges that consumers mistakenly believed that Watkins's and McCormick's tins contained the same volume of black pepper and, as a result, that McCormick's black pepper was significantly cheaper.   <u>Id.</u> at 10.   For example, McCormick's small tin sold for an average retail price of $2.10 while Watkins's small tin had an average retail price of $3.17. Nelson Decl. Ex 37.   McCormick's per-ounce price, however, was $1.40 while Watkins's was $1.58 per ounce – a much smaller gap. <u>Id.</u>   For the medium tin, McCormick's was priced at $3.22 while

---

[2] Watkins alleges that the volume reduction resulted in "nonfunctional slack-fill." Federal regulations define slack-fill as "the difference between the actual capacity of a container and the volume of the product contained therein." 21 C.F.R. 100.100. The United States Food and Drug Administration, which promulgated the regulation, defines food containers containing non-functional slack-fill as "misleading." <u>Id.</u>

Watkins's carried a $4.11 price tag, but McCormick's per-ounce cost was $1.07 while Watkins's was $1.03.  Id.

At the end of the test, Walmart dropped Watkins's black pepper from its shelves.  Keeter Dep. at 41:2-4.  Walmart cited below expectation sales numbers as the reason for its decision.  Id. at 41:8-11; Rigley Dep. at 32:10-33:4.  Watkins acknowledges its black pepper performed below expectations, but it argues that McCormick's pricing scheme impacted its sales and contributed to its poor performance.  2d Am. Compl. at 11.

Based on these allegations, Watkins filed this lawsuit, bringing claims under the Lanham Act, three state statutes punishing unfair trade practices, and the common law tort of unfair competition.  Id. at 2.  Watkins's unfair competition claim was dismissed, but its Lanham Act and state law claims remain.  ECF No. 61-34.  Watkins seeks money damages, disgorgement of McCormick's profits, and injunctive relief.  2d Am. Compl. at 35-36.

McCormick now moves to exclude one of Watkins's experts, arguing that there is no reliable basis or evidence in the record to support his opinions.  McCormick also moves for summary judgment, arguing that Watkins has failed to show that it suffered any injury proximately caused by McCormick's reduced-volume black pepper tins.

**DISCUSSION**

**I.   Lanham Act[3]**

In relevant part, the Lanham Act seeks to "protect persons engaged in commerce against false advertising and unfair competition." Am. Italian Pasta Co. v. New World Pasta Co., 371 F.3d 387, 390 (8th Cir. 2004) (citation and internal quotation marks omitted). Specifically, the Lanham Act "prohibits commercial advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of the advertiser's or another person's goods, services, or commercial activities." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179-80 (8th Cir. 1998) (citation omitted). Remedies available include injunctive relief, plaintiff's damages, defendant's profits, and costs of the action, subject to the principles of equity. 15 U.S.C. §§ 1116(a), 1117(a); see also Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d 802, 814 (D. Minn. 2011).

To prevail on a Lanham Act false-advertising claim, a plaintiff must prove five elements:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the

---

[3] Watkins' state law claims mirror its Lanham Act claim, and resolution of the factual and legal questions under the Lanham Act will resolve the corresponding issues under the state law claims. See Wing Enters., Inc. v. Tricam Indus., Inc., 511 F. Supp. 3d 957, 964 (D. Minn. 2021).

tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

United Indus. Corp., 140 F.3d at 1180. "Failure to establish any one element" defeats a plaintiff's claim. Allsup, Inc. v. Advantage 2000 Consultants Inc., 428 F.3d 1135, 1138 (8th Cir. 2005).

For purposes of McCormick's motions, the parties focus on the fifth element – that the plaintiff "has been or is likely to be injured as a result of the [defendant's] false statement." United Indus. Corp., 140 F.3d at 1180. McCormick argues that Watkins's expert testimony on damages should be excluded and thus that Watkins has not established injury or causation for any of the forms of relief it seeks. Watkins counters that its experts provide reliable, admissible evidence of both. The court begins with McCormick's motion to exclude one of Watkins's experts, as its resolution affects the analysis of the summary judgment issues.

## II.  McCormick's Motion to Exclude Expert Testimony

McCormick first seeks to exclude Watkins's damages expert, Donald Alan Gorowsky. McCormick does not challenge Gorowsky's qualifications but argues that his opinions are speculative and unsupported by facts in the record.

8

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill experience, training or education may testify in the form of an opinion or otherwise." An expert may testify if:

> [T]he expert's scientific, technical, or other specialized will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)-(d).

Under Rule 702, the court acts as a gatekeeper to determine "whether the witness is qualified to offer expert testimony." Schmidt v. City of Bella Villa, 557 F.3d 564, 570 (8th Cir. 2009) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)). An expert must possess the "knowledge, skill, experience, training, or education sufficient to assist the trier of fact ...." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citation and internal quotation marks omitted). This standard is satisfied when the expert's testimony "advances the trier of fact's understanding to any degree." Id. (citation and internal quotation marks omitted).

Rule 702 also "require[s] that the area of the witness's competence matches the subject matter of the witness's testimony." Id. at 1101 (citation and internal quotation marks omitted). "Gaps in an expert witness's qualifications or knowledge generally go to

the weight of the witness's testimony, not its admissibility."
Id. at 1100 (citations and internal quotation marks omitted).

Further, the court must "ensure that any and all scientific
testimony or evidence admitted is not only relevant, but reliable."
Schmidt, 557 F.3d at 570 (citing Daubert, 509 U.S. at 589). The
court considers several nonexclusive factors when determining the
reliability of an expert's opinion, including:

> (1) whether the theory or technique can be (and has been)
> tested; (2) whether the theory or technique has been
> subjected to peer review and publication; (3) the known
> or potential rate of error; (4) whether the theory has
> been generally accepted; ... [(5)] whether the expertise
> was developed for litigation or naturally flowed from
> the expert's research; [(6)] whether the proposed expert
> ruled out other alternative explanations; and [(7)]
> whether the proposed expert sufficiently connected the
> proposed testimony with the facts of the case.

Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686-87 (8th Cir. 2001)
(citations and internal quotation marks omitted). This "flexible
and fact specific" inquiry allows the court to "use, adapt, or
reject [the] factors as the particular case demands." Unrein v.
Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005). The
proponent of the expert testimony bears the burden of proving its
admissibility by a preponderance of the evidence. See Lauzon, 270
F.3d at 686.

Gorowsky offers three opinions regarding Watkins's damages in
his expert report. First, Gorowsky calculated Watkins's lost
profits during the Walmart test. Second, Gorowsky calculated the

profits Watkins would have realized between 2015 and 2020 if the test had been successful and Walmart had expanded the distribution of Watkins's black pepper to 3,000 stores.   Third, in support of Watkins's disgorgement claim, Gorowsky calculated McCormick's profits from its reduced-volume tins.

**A. Lost Profits During the Walmart Test Period**

For the first opinion, McCormick argues that Gorowsky improperly based his calculation of lost profits during the test period on Walmart's and Watkins's sales forecasts.   McCormick contends that these forecasts are speculative and unreliable.

Watkins counters that pre-litigation projections are an appropriate method to determine lost profits.   Watkins also notes that Gorowsky reviewed a substantial number of documents and conducted interviews with multiple Watkins employees to evaluate the validity of the sales forecasts.   According to Watkins, reliable pre-litigation projections provide sufficient factual basis to support Gorowsky's conclusions.

The court agrees with Watkins.   The use of internal projections does not automatically mean an expert opinion is unreliable.   Cf. Supervalu, Inc. v. Assoc. Grocers, Inc., No. 04-2936, 2007 WL 624342, at *6 (D. Minn. Jan. 3, 2007).   But "reliance on internal estimates or projections may not be reasonable where the underlying projections are suspect or the expert does not make an effort to consider their reliability."   Scoular Co. v. Ceres

Global Ag. Corp., No. 14-1881, 2017 WL 3535210, at *15 (D. Minn. Aug. 16, 2017) (citation omitted). Thus, a court must evaluate whether the expert's use of internal projections was reasonable. US Salt, Inc. v. Broken Arrow, Inc., No. 07-1988, 2008 WL 2277602, at *1 (D. Minn. May 30, 2008).

Here, Watkins's and Walmart's sales projections provided a reasonable basis for determining lost profits. The companies established their projections independently and in the ordinary course of business. The projections served internal purposes – inventory management for Watkins and profit and loss forecasting for Walmart – that incentivized realistic projections. Finally, Gorowsky analyzed market conditions, reviewed relevant information and documents, and interviewed employees to verify the reasonableness of the forecasts.

Therefore, the court finds that Gorowsky's reliance on Watkins's and Walmart's internal projections was not unreasonable and does not render his opinion unreliable. McCormick may still raise challenges to the factual basis of Gorowsky's opinion on cross-examination, as those challenges go to credibility rather than admissibility.

**B. Lost Profits During the Post-Test Period**

Regarding the second opinion, McCormick argues that Gorowsky's projection of lost profits from 2015 to 2020 is speculative and unreliable. McCormick contends that there is no

12

basis for Watkins, and Gorowsky, to assume that the Walmart test would have been successful absent McCormick's conduct.  Further, McCormick argues that there is no evidence in the record that, even if the test had been successful, Walmart would have expanded Watkins's black pepper to 3,000 stores.  Thus, McCormick argues that any calculation of profits flowing from those events is speculative.

Watkins counters that Gorowsky calculated lost profits for this "post-test" period using another long-accepted approach - the yardstick method.  Gorowsky used Watkins's vanilla extract as a yardstick and calculated the profits Watkins would have realized if Walmart had expanded its black pepper distribution as it had its vanilla extract.  Expert Report of Donald A. Gorowsky at 14.

The yardstick method uses a comparable product, company, or industry to determine lost profits resulting from unfair competitive practices. Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005); Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc., 661 F. Supp. 2d 1039, 1054-55 (D. Minn 2009).  "[T]he businesses used as a standard must be as nearly identical to the plaintiff's as possible."  Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974).  "[E]xact correlation is not necessary," but if the comparison product is not adequately similar, "the comparison is manifestly unreliable and cannot logically advance a material aspect of the proposing

party's case."  Loeffel Steel Prods., Inc., 387 F. Supp. 2d at 812
(citations and internal quotation marks omitted).

Gorowsky and Watkins assert that vanilla extract is an
appropriate yardstick for several reasons.  First, both products
fall into the batters and seasonings category and are purchased by
the same Walmart buyer.  Second, both products function as staple
products for consumers.  Third, both products participated in
equivalent Walmart tests and competed against McCormick as the
dominant brand in the market in those tests.  In contrast,
McCormick argues that vanilla extract is not sufficiently similar
and that there is no basis for Gorowsky's calculation of profits
using the comparison.

The court again agrees with Watkins.  Although the comparison
between vanilla extract and black pepper is not perfect, the court
finds that there are enough similarities to defeat McCormick's
motion to exclude the expert testimony.  Again, McCormick may
challenge the credibility of this comparison on cross-examination.

### C. Disgorgement of Profits

Finally, McCormick argues that Gorowsky's calculation of
McCormick's profits for the disgorgement claim is flawed.
Specifically, McCormick argues that Gorowsky failed to establish
or even analyze whether McCormick's profits were attributable to
its allegedly deceptive packaging.  Further, McCormick argues that
Gorowsky's calculation failed to consider or incorporate evidence

14

suggesting that Watkins suffered no injury from McCormick's conduct.

Watkins offers a different interpretation of the requirements for disgorgement of profits under the Lanham Act. Watkins argues that once it established that it suffered injury in fact, it need not prove attribution or diversion of sales in order to bring a disgorgement claim. According to Watkins, it need only establish McCormick's sales during the relevant time period, and then the burden shifts to McCormick to prove that any of those sales were not due to the allegedly unfair competitive practices.[4]

The court again agrees with Watkins. The key to this question is distinguishing "Lanham Act violations and Lanham Act remedies." Wing Enters., Inc., 511 F. Supp. 3d at 973. There are "elements necessary to prove a breach of the law," and there are "elements necessary to justify a certain remedy for that breach." Web Printing Controls Co. v. Oxy-Dry Corp., 906 F.2d 1202, 1204 (7th Cir. 1990). These inquiries "should be kept separate because a violation of the Lanham Act can be remedied in more ways than one." Id.

---

[4] Both parties cite extensively to case law supporting their positions. The court acknowledges that there are conflicting approaches to this issue, and there is no binding Eighth Circuit precedent on point. The court, however, finds cases from within the District of Minnesota to be persuasive in their reasoning and follows the same approach. See Aviva Sports, Inc., 829 F. Supp. 2d at 802; Wing Enters., Inc., 511 F. Supp. 3d at 957.

In the first stage of inquiry, a court considers whether a plaintiff possesses statutory standing. "The Supreme Court has adopted a two-part test for determining 'statutory' standing in Lanham Act cases." Snac Lite, LLC v. Nuts 'N More, LLC, No. 2:14-cv-01695-RDP, 2016 WL 6778268, at *14 (N.D. Ala. Nov. 16, 2016) (citing Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 129-32 (2014)). "First, a plaintiff must demonstrate that his interests 'fall within the zone of interests protected by the law invoked.'" Id. (quoting Lexmark Intern., Inc., 572 U.S. at 129). Thus, a plaintiff "must allege an injury to a commercial interest in reputation or sales." Lexmark Intern., Inc., 572 U.S. at 131-32. Second, "a plaintiff must demonstrate that its injuries were proximately caused by violations of the Lanham Act," meaning that "the harm alleged has a sufficiently close connection to the conduct the statute prohibits." Snac Lite, LLC, 2016 WL 6778268 at *14 (citing Lexmark Intern., Inc., 572 U.S. at 132-34).

Once a plaintiff establishes standing, the second stage of inquiry considers remedies. At this stage, the court assesses whether a plaintiff has met the burden for the specific remedy sought. Aviva Sports, Inc., 829 F. Supp. 2d at 814 ("The plaintiff's burden for this element depends on what type of relief is sought.").

For money damages, "a plaintiff must prove both actual damages and a causal link between defendant's violation and those damages."

16

Id. at 815 (citations and internal quotation marks omitted).  For injunctive relief, a plaintiff need not show specific damages but "must prove injury, or likelihood of injury, and a causal link between that injury and the defendant's conduct."  Id.; see also Wing Enters., Inc. v. Tricam Indus., Inc., 511 F. Supp. 3d 957, 973 (D. Minn. 2021).  For disgorgement of profits, a plaintiff need only show the defendant's "sales of the allegedly falsely advertised products," after which the burden shifts to the defendant to prove "any costs or deductions."  Aviva Sports, Inc., 829 F. Supp. 2d at 819.

Disgorgement imposes a lower burden than money damages and injunctive relief because it serves a different purpose. Disgorgement, an equitable remedy, targets the wrongdoer and seeks to deter improper conduct and prevent unjust enrichment.  Wing Enters., Inc., 511 F. Supp. 3d at 974.  To achieve these purposes, any plaintiff with standing may seek to eliminate defendant's ill-gotten gains by pursuing disgorgement of its profits.  Id.

McCormick, however, argues that the United States Supreme Court decision in Lexmark International, Inc. v. Static Control Components altered this analytical framework.  572 U.S. 118 (2014). According to McCormick, Lexmark stands for the proposition that any form of relief under the Lanham Act must be tied to harm suffered by the plaintiff.

This interpretation, however, focuses on the wrong stage of the two-part inquiry.  Lexmark addresses the first stage and clarifies the standard plaintiffs must meet to establish standing to bring a claim at all.  Id. at 128; see also Web Printing Controls Co., 906 F.2d at 1204.  To be sure, Lexmark requires plaintiffs to establish that they suffered an "injury flowing directly from the deception wrought by the defendant's advertising."  Lexmark Intern., Inc., 572 U.S. at 133.  Once a plaintiff establishes standing, however, Lexmark does not limit the remedies available or alter plaintiffs' burden in seeking different forms of relief. Id. at 135-36.  Thus, Lexmark explains which plaintiff can bring a claim, not which relief a proper plaintiff can seek.

Accordingly, the court finds that Gorowsky's third opinion should not be excluded.  In his report, Gorowsky properly calculated McCormick's sales during the time of its allegedly deceptive packaging.  In response, McCormick may contest the calculation through cross-examination or prove that any portion of these sales was not due to its allegedly deceptive conduct.

**D. Rule 403**

McCormick also argues that Gorowsky's opinions should be excluded under Rule 403.  Rule 403 allows the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  McCormick argues that Gorowsky's opinions are likely to

18

result in prejudice and confusion because his calculations could be understood as compensation for harm to Watkins despite a lack of evidence of such harm.  The court, however, finds no basis to exclude Gorowsky's opinions under Rule 403.

## III. McCormick's Motion for Summary Judgment

Next, McCormick moves for summary judgment, arguing that Watkins has not created a triable issue on the injury and causation element of its Lanham Act claim.  In particular, McCormick argues that Watkins has not established that it suffered an injury proximately caused by McCormick's alleged false advertising.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

The court views all evidence and inferences in a light most favorable to the nonmoving party.  See id. at 255.  The nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial; that is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Reeves v. Sanderson Plumbing Prods., Inc., 530

19

U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249-50; Celotex v. Catrett, 477 U.S. 317, 324 (1986).   Moreover, if a plaintiff cannot support each essential element of its claim, the court must grant summary judgment, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

As already noted, Watkins's burden varies for the different remedies it seeks.   Thus, the court considers each remedy separately.

**B.   Money Damages**

For money damages, a plaintiff "must prove both actual damages and a causal link between defendant's violation and those damages." Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 515 (8th Cir. 1996).   The record must "adequately support[] all items of damages claimed," but "courts may consider 'the difficulty of proving an exact amount of damages from false advertising.'" Aviva Sports, Inc., 829 F. Supp. 2d at 816 (quoting Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1336 (8th Cir. 1997)).   Further, a plaintiff, need only prove "the fact of damage with certainty, it need not prove the amount of damage with certainty." Id. (emphasis in original).

The record must also "establish[] a causal link between the damages and the defendant's conduct, lest the award become speculative."   Id. (citation and internal quotation marks

omitted).  This causation requirement ensures that "[a]ny award of damages ... serve[s] as compensation, not a penalty."  Id. at 815-16 (citing 15 U.S.C. § 1117(a)).

### 1. Watkins's Actual Damages

Watkins advances two theories to establish that it suffered injury.  First, it argues that the consumer survey conducted by its expert establishes competitive injury.[5]  Watkins points to the survey's two conclusions: 1) that McCormick's reduced-volume tins likely deceived consumers; and 2) that the deception was material to consumer buying decisions.  According to Watkins, these findings establish that it suffered injury.

Second, Watkins contends that the evidence of its lost sales during and after the Walmart test also demonstrate that it suffered injury.  Watkins argues that it lost sales during the test period because its primary competitor, McCormick, falsely advertised its rival products.  Further, Watkins contends that because McCormick diverted sales during the test period, Walmart did not expand Watkins's black pepper to 3,000 stores.  According to Watkins, this failure to expand resulted in an additional set of lost sales.

McCormick counters that Watkins offers no reliable evidence to support its claimed lost sales.  For lost sales during the test

---

[5] Dr. Larry Chiagouris designed and conducted the consumer study, and McCormick did not move to exclude Dr. Chiagouris's report or any of his opinions.

period, McCormick argues that Watkins's, and Walmart's, sales projections were speculative and not grounded in historical sales data.  For lost sales in the post-test period, McCormick argues that Watkins's hopes of expansion to 3,000 stores lacked any objective basis.  McCormick highlights that Walmart never set metrics to determine whether the test was successful and never discussed expansion with Watkins even if the test was successful.

The court finds that a factual dispute exists on the issue of injury.  The court finds that the expert's findings of deception and materiality in the consumer survey create a triable issue as to whether Watkins suffered injury.  See adidas-Am., Inc. v. Payless Shoesource, Inc., 546 F. Supp. 2d 1029, 1087 (D. Or. 2008). Further, Watkins's expert testimony supports its argument that it lost sales both during and after the test period.  For the reasons discussed previously, this testimony is admissible and creates a factual dispute as to whether Watkins suffered injury.

### 2. **Causation**

Next, McCormick argues that Watkins offers no competent evidence that McCormick's packaging had any effect on Watkins's sales – that is, that McCormick's conduct caused harm to Watkins. McCormick argues that Walmart did not pinpoint McCormick's packaging as the reason for Watkins's failed test and instead attributed it to disappointing sales numbers.  McCormick also notes

that Walmart expressed concerns before the test period about the high price of Watkins's black pepper.[6]

The court finds that a factual dispute exists on this issue. To McCormick's arguments, although Walmart indicated the test failed due to lower than expected sales, that does not mean that McCormick's conduct did not impact Watkins's sales. Further, even though Walmart indicated that Watkins's black pepper was priced too high, McCormick's conduct likely only exacerbated this concern by making Watkins's tins appear even more expensive comparatively.

On the other hand, Watkins introduced evidence showing that its primary competitor during the Walmart test was McCormick. Rigley Dep. at 34:8-18; O'Leary Dep. at 17:19-18:2, 41:2-6. Watkins's evidence also shows that McCormick's tins contained less volume of black pepper than Watkins's and cost less per tin as a result. Nelson Decl. Ex. 29, at 15. Expert evidence proffered by Watkins suggests that consumers may have been misled by the two products' comparative prices and that such confusion may have impacted their buying decisions. Id. Ex. 46. This evidence supports causation and creates a factual dispute.

---

[6] McCormick also flags that Walmart terminated another Watkins product line at the same time as the black pepper test, which McCormick suggests indicates that Walmart was simply changing its product assortment. Even if Walmart was adjusting its product offerings, however, Watkins's performance in the pepper test likely affected Walmart's decision-making given Walmart's comments to that effect.

**C.    Disgorgement**

Watkins also seeks disgorgement of McCormick's profits. McCormick's primary argument[7] is that Watkins failed to establish a causal link between McCormick's conduct and the profits Watkins seeks to disgorge.  According to McCormick, a plaintiff seeking disgorgement under the Lanham Act must establish that the profits were diverted from the plaintiff's own sales.  McCormick also argues that Watkins must show that the profits are attributable to the false advertising.  Watkins counters, arguing that the Lanham Act does not require proof of diversion or attribution.

The court finds that the Lanham Act requires neither proof of diversion nor attribution for disgorgement of profits.  For the reasons already discussed, a plaintiff that can show it was injured, in some form, by the defendant's conduct may recover the defendant's profits.  To do so, a plaintiff need only prove defendant's sales of the falsely advertised product.  The Lanham Act then permits a defendant to deduct profits that it can prove were not earned due to its violative conduct.[8]  See 15 U.S.C.

---

[7] McCormick also argues that its sales during the relevant timeframe declined, and thus, it did not realize any gains from its reduced-volume tins.  The court finds that this assertion simply creates a factual dispute on which summary judgment is inappropriate.

[8] Additionally, other limitations prevent windfalls to plaintiffs.  First, "a plaintiff's recovery may include both actual damages and the defendant's profits," but "a party is not entitled to recover [] profits to the extent that they duplicate [] actual damages."  Safco Prods. Co. v. Welcome Prods., Inc., 799 F. Supp.

§ 1117(a); <u>Aviva Sports, Inc.</u>, 829 F. Supp. 2d at 818-19 (citing

<u>Rexall Sundown, Inc. v. Perrigo Co.</u>, 707 F. Supp. 2d 357, 359-62

(E.D.N.Y. 2010)).

Here, Watkins seeks disgorgement, and to do so, needs only to

establish McCormick's profits from its allegedly improper conduct.

Watkins has carried that burden.  Accordingly, the court denies

McCormick's motion for summary judgment on Watkins's disgorgement

theory.

**E. Injunctive Relief**

Finally, McCormick did not address Watkins's claim for

injunctive relief in its argument but appears to include it in its

motion for summary judgment on "all of Watkins's claims."  ECF No.

68, at 1.  To obtain an injunction, "a plaintiff must prove injury,

or likelihood of injury, and a causal link between that injury and

the defendant's conduct."  <u>Aviva Sports, Inc.</u>, 829 F. Supp. 2d at

815; <u>Wing Enters., Inc.</u>, 511 F. Supp. 3d at 973.  The court finds

that Watkins has met its burden for injunctive relief, and those

claims will go forward.

---

2d 967, 994 (D. Minn. 2011) (citation and internal quotation marks
omitted).    Second, any award of profits is subject to the
principles of equity.  <u>Wildlife Rsch. Ctr. v. Robinson Outdoors,
Inc.</u>, 409 F. Supp. 2d 1131, 1135 (D. Minn. 2005).

**CONCLUSION**

Accordingly, based on the above, IT IS HEREBY ORDERED that:

1.    Defendant's motion to exclude expert Donald Alan Gorowsky [ECF No. 70] is denied; and

2.    Defendant's motion for summary judgment [ECF No. 68] is denied.


Dated: December 7, 2021

s/David S. Doty
David S. Doty, Judge
United States District Court